May I please have the podium up a bit? There's a button right to your right there. I think that'll help our audio a little. Okay. And I'll try to speak clearly and loud. May I please have the podium up a bit? Yes. Okay. Thank you. My name is Dan Blagan and I represent the Plaintiff Appellant Smoky Hills Wind Farm here. The only issue on Smoky Hills' appeal is whether the court below was correct in excluding as damages invoices for curtailed energy submitted more than 15 days after the end of the month in which the curtailment occurred. I will address that issue first and then, time permitting, I will briefly address Independence's arguments that the court incorrectly interpreted the definition of emergency curtailment and the court incorrectly denied their counterclaim related to the negative L&P. Now, in this situation, it's undisputed that the only provision in the contract, which is a power purchase agreement, that sets any specific deadline for invoicing is section 9.1. And the court below found correctly that 9.1 only applies to energy that was actually generated and delivered and that issue is now undisputed. It was not appealed. So that expressed time limit does not apply to these invoices that are at issue in our appeal today. Therefore, the question for this court is whether the district court was correct in implying a reasonable time requirement when the contract did not and when Independence did not raise that issue below, setting a reasonable time as 15 days after the end of the month, the same time that was contractually stated for generated energy, invoicing for generated energy, and then using that interpretation to deny payment on six of the 12 invoices submitted by plaintiff to defendant, invoices for which liability was found, but they were relieved of their obligation to pay the invoices due to this implied time limit. Now, we have three points in our brief, all of which we believe merit your attention. But due to our limited time today, I will focus on only two of those points that we believe are dispositive. First, even assuming a time for submittal was to be implied, Smoky Hills substantially performed under the contract and is entitled to compensation. Second, that the court erred in disregarding the lack of prejudice to appellee City of Independence, a lack of prejudice the court found in its other findings but ignored on the issue of these invoices. Now, with regard to substantial performance. Did you raise that to the district court? We did not raise it. Neither side raised that issue to the district court. Like validity of the contract, like the validity of the signatures, it was not a contested fact. The only issue with regard to invoices that was raised, there were two, was the strict application of 9.1, which is for generated energy invoices, to these invoices, an issue on which the court correctly found that that provision does not apply. And then, arguably, the Latches argument would have potentially touched on these, but Latches, of course, assumes that the contract was complied with. It's not an element of the contract issue. It's an unreasonable delay issue. And on that one, the court also found that there had been no unreasonable delay and there was no injury to Independence. So, specifically, this issue is not raised by either side. But to get to a reversal, which you might see, you'd have to show plain error, wouldn't you? Not in this issue because it's a de novo review of a contract interpretation question. We don't believe the plain error standard applies here. There's no disputed fact issues. It was a sua sponte raise of a legal question by the judge without opportunity to be heard on it. We believe it was an error and it should be a de novo review. So, for substantial performance, it seems to me that even if we accept your proposition that it's a legal question for us, wouldn't there be fact finding that would be relevant to substantial performance that might not have... I mean, it's one thing to say there's no factual disputes in the record. It's another to say the facts weren't even developed on a particular legal issue. Well, there's two issues there. First, the relevant facts to substantial performance are undisputed. What the contract says, when the invoices were submitted, the steps taken. In fact, when we attempted below to put on additional evidence just to kind of give context around these invoices and what happened with them, Independence objected to that evidence and stated that they were not disputing the invoices, the accuracy of the calculation, the amounts of them. So that issue, even to attempt to try to put more on, was interrupted by Independence in the court below. But there are no disputed facts that are relevant to this issue. The specific issues with regard to timing, the specific issues with regard to what the contract requires before an invoice for curtailed energy can even be submitted, are all undisputed. Frankly, a lot of them are just straight contract questions. So was it Smokey Hill's perspective that there was no time limit whatsoever and that at any future point that you got a notion you could submit an invoice? It really never got to that issue. I mean, there was, I think, a hypothetical posited in the order that a decade later, could we come back for an invoice?  And it's really, in our position, not a relevant question here, because we're not talking about invoices that were that far out from the time, which is why we think the substantial performance... But what did the contract contemplate, since it didn't give a time period for those? The contract did not specifically, and I apologize, the contract did not specifically contemplate a time. It had a procedure for the parties working together to analyze the curtailed energy, collecting the data, determine a process for submitting the invoices. It did not contemplate a specific time, and time is not specifically of the essence in the contract. But wouldn't it make sense under contract interpretation principles to imply a reasonable time period? It certainly could, Your Honor, and that's what the court did. We believe what the court implied was far too short, given the circumstances in the contract. But I guess part of our point today is that even if there's a time implied, they still have to get to the question of substantial performance and prejudice, both of which we believe are dispositive. So yes, the court certainly could have, and did in this instance, imply a reasonable time. We don't believe that the court properly went through the necessary elements to do that. In fact, prejudice is one of the elements, one of the considerations that should have happened. And to the extent the court considered prejudice, the court actually specifically found independence was not prejudice. And yet the court implied the 15-day time. So we do believe it was error to pick the 15 days. Well, how were you prejudiced? How were we prejudiced? Yes. Well, we're prejudiced in that we've been denied payment under invoices that the court found were absolutely, we were entitled to payment but for the time they were submitted. But doesn't the contract itself, if you look at it, contemplates monthly invoicing generally? And I understand that there's been no appeal on the interpretation of 9.1. But isn't that something that can frame the discussion as to what's a reasonable time to perform? Because I hear you saying that you would agree that as a general principle of Kansas contract law, if no time is stated for performance, the time for performance is a reasonable time. And why isn't it a relevant consideration to look at what the parties considered generally was a reasonable time under the contract, that is, monthly invoicing? I guess it's a matter of gradient there. Because assuming the court is going to, under Kansas law, imply a reasonable time, and I think there's little debate, but assuming that that is the, that's what the court believes that the case law in Kansas says. It's certainly, the court could consider that. But the court also has to consider the other things it found. For example, 8.2, which speaks directly to curtailed energy. I mean, putting aside the fact that 9.1 clearly only speaks to what's been generated and has been measured as it goes out the door and can be calculated quickly. 8.2 says that if there has been a curtailment, then here's these things the parties have to collectively do. They have to have sufficient wind monitoring, measuring devices. And there's 99 turbines here. This isn't just a single turbine where you're just measuring what comes in. So there's a giant field of these turbines. Does it matter that when this contract was entered into, the wind field had not yet been developed? And so there's a period of development to the wind field while it's being constructed and while you go through that process that a reasonable and prudent party would have anticipated the potential for curtailment, given the fact that they're common in the industry, and that those devices would have been designed into the plan. And is it reasonable to say it took you a year and a half to come up with a protocol when during the entire construction process, that protocol could have been developed, discussed, and otherwise put in place? Well, it's possible that there could have been a protocol put in place at the time. But remember, the contract specifically addresses that and speaks to in the future, if a curtailment occurs, this will happen. Keeping in mind, too, the evidence in the record shows that this particular wind farm was a bit unusual in that usually one power company buys the entire output. And in this situation, we have multiple off-takers, they're called, taking the power off of them. So at the time, they anticipated that the curtailments could occur of different types, which gets, of course, into the City of Independence's appeal. They had all of these issues they needed to address, and they contemplated that they were going to have to calculate this. They certainly did not say in the contract that you should have a method to calculate this at the time of contract. They said, in the future, when it happens, you'll have a method. Well, if that's the way the contract views it, then the reasonable time has to include time to develop that. Didn't the district court make some findings on that, though, in terms of, well, I just don't find the reasons for the delay on these particular invoices that went beyond 15 days to be credible? The findings on that are a bit unclear because, at the same time, the court below found that the calculation was reasonable and that the steps we took were reasonable and that there was no harm to independence. Now, the court does make comments about not sure that she believed the credibility of a witness who testified on some of these issues, but it also kind of mixed together two concepts. One is the initial time period to develop, essentially from scratch, the very technical mathematical calculation to come up with this number. And then there was a question of... Did the court make the finding on that one? And then you can get to your second one. But on the first part, in your view, make a finding on whether Smokey had in good faith or reasonably moved forward to reach that goal? In our view, the court found that the process in the first instance was reasonable because there are places in the record or in the order where she talks about the methodology being reasonable and there being no harm from how we went about doing that. There was also a question because the two biggest invoices are for the 2012-early 2013 time period when they're needing to figure out how to calculate this. There were a couple of later invoices that took longer than 15 days because the person who was actually the one doing the math in the calculation was unavailable and so they didn't get out right away. And the court did specifically talk about not being sure that made sense, but it was a little unclear exactly what the court was not believing about Mr. McGrail's testimony. And based upon other rulings in the court's decision, she certainly seemed to believe that the reason for the initial time made sense. It just did not fit within her 15-day implied reasonable time. So there's one distinction here between the, if I'm hearing you right, between the invoices that were delayed because of the lack of methodology and the invoices that were delayed because the one fellow who could do it was out. That certainly is a, there is a distinction between those. But you think all of them, but you're appealing the denial of all of those. Well, because I believe that substantial performance and prejudice apply equally to both. And I think I interrupted you. You were saying you had two. I interrupted you halfway through, so I'll let you. Actually, I think I did get everything in that I needed to get in on that issue. So as I said, the first issue is substantial performance. The essential purpose here, this is a contract for the purchase of power. The power was received. It talks about an interruption of the purchase of power, which is curtailment, which is an ancillary issue to the contract, not an essential purpose. It's a potential contingency. And then even beyond that, it talks about how to invoice for that contingent possibility, which we believe takes that squarely out of the essential purpose. Therefore, if we substantially performed, regardless of what might in the abstract be a reasonable time for performance, we believe we are entitled to that compensation under the doctrine of substantial performance and that independents shouldn't get the windfall, even though they were not harmed by any of this. They should not get the windfall in that situation. Briefly, on the second point, the lack of prejudice is similar. I touched on this very briefly. There has been, in fact, specific findings of the court that there was no prejudice or harm to independents as a result of how we invoiced for this. And if you're going to set a reasonable time, that is a consideration. We believe because of the status of it and because it's not really a contested issue, that that's really a de novo question and that we should be entitled to those invoices, payments for that reason there. And there's other issues in the brief. I'm reserving some time to come back up here in a moment. So if there's no further questions right now, I will stop for now. Thank you. Thank you, Mr. Blagan. Mr. Robbins. Good morning, Your Honors. Alan Robbins on behalf of the city of Independence, Missouri. May it please the court. I will start by addressing some of the points that Mr. Blagan just addressed with the court. First of all, they did never raise us below. The argument of substantial performance is being raised for the first time on appeal. Therefore, we had no opportunity, obviously, to address it below. It is not our burden to have raised the question of whether they substantially complied with the contract. We had alleged that they had not. They never came back and said, well, we substantially complied. They argued only that there's no time limit in the contract. They made that tactical decision. That tactical decision didn't work for them, and now they're trying another tack for the first time before this court. It is not purely a legal issue. For example, Mr. Blagan now argues that the timeliness and when they get paid is really not an essential part of the contract. There's no credibility to that argument. And if necessary, we would put on factual evidence if there had been an opportunity to show how important the revenue stream is to them. In other contexts, they emphasize and make a big deal about their tax investors. Well, their tax investors want to get paid. There's nothing in the contract that suggests that the money paid for energy produced is greener than the money paid for energy not produced and curtailed. There's just no credibility to the argument that it doesn't matter to them when they get paid for curtailed energy and it only matters for produced energy. Plainly, the contract does contemplate monthly billing. The one provision in there, not surprisingly, is 15 days after the month. There's certainly no indication in the contract that anything different was contemplated for payments for curtailed energy. Well, doesn't it make sense that it might be different because of the nature of the unexpected nature of curtailments that would come from SPP or FERC or wherever it may come from? No, we don't think so, Your Honor. And the reason is they are doing it after 15 days today when it happens. They have in the record billed within 15 days. The lower court did not wipe out every invoice for curtailed energy, only those that were substantially late. We have a table in our brief that shows how late they were. We're not talking about a day or two. These are very substantial periods of time. Nothing in the contract excuses their performance because they didn't know how to do it or they didn't staff up to do it.  Finally, while the city had an opportunity to participate with them, if it was so inclined to help develop the calculations or figure out what the amount of energy was, the city has no information that they don't have. They are the owner-operator of the project. The city has nothing to offer. What the city could do is, if it had objected to the calculation of amount, is then engage in discussions, bring whatever it might have brought to that. The city never challenged the amount of the calculated amount of the energy that would have been produced. We certainly challenged the nature of the curtailments, which I'm going to turn to in a moment, and we certainly challenged the timeliness of the billing. But they don't need the city to figure out how to bill the city for this. And, in fact, they have not involved the city in the development of that. So trying to shift the blame over to the city, again, is really just a distraction technique, and they continue to bill within the 15-day period and other circumstances. I would like, with the court's permission, to turn to the nature of the curtailments. As the court likely understands from the briefs at this point, the contract set up two categories of curtailments, economic and emergency. And, basically, an economic is every curtailment that's not an emergency. We believe the curtailments at issue, which are not all the curtailments that have happened, but we're talking about the disputed curtailments, are emergency curtailments. The contract, first of all, defines emergency by referencing the conditions described in the TLR procedures under Level 6. And one of the errors that the court below made is that it confused the difference between conditions, which is what the contract definition turns on, and the different responses that SPP may take in response to those conditions, how they deem to handle it as they operate and maintain the reliability of the system. The conditions existed. First of all, the contract is clear. It refers only to the conditions. There is no dispute about that. The evidence shows, additionally, that those conditions, as described in the TLR procedures under Level 6, were present during each of the disputed curtailments. The SPP witnesses so testify. The court didn't talk about that, but they did, and it's in the record. Mr. Oxendale, in addition to pointing out, says that they take action when necessary, that it was timely, it was a time-sensitive manner, it was critical to maintaining the reliability of the system, and they directly issued directives to curtail generation because other steps either were not available or would not give them the relief that they needed, but it was time-sensitive and critical that they get quick response, and that's why they issued the directives. Only under Level 6 is curtailment of generation, referred to as re-dispatch, listed as among the tools that SPP can invoke at that level. At Levels 1 through 5, which are not an issue here, those are purely transmission curtailments. At Level 6, they can curtail transmission or generation or some combination. And by the way, the notion argued by Smoky Hills that really there's no difference between curtailing generation and curtailing transmission is just fundamentally not true. Transmission is redirecting the traffic. A directive saying, as they received here, don't generate, means you cannot inject any more energy into the system. We're not telling you to take a detour. We're telling you you can't get on the road to begin with. Very big difference. Now... The district court, though, I think looked at it and said, well, you've got to look at the TLR procedure generally as a bigger picture and that this was a technical term that had to be defined for purposes of this industry. Yes, the court said that, and we think the court is in error. The court, in our opinion, is substituting its judgment for what a reasonable definition would be for that of the parties. The parties could have invoked all of the TLR procedures. They did not. They specifically referenced the conditions under Level 6. Secondly, they could have said only if an emergency will occur, only if SPP issues an actual TLR 6 order, a very distinct, rare, in fact, never purposely done by SPP in its history, form of relief. They could have said that very easily. They did not. They talked about the conditions. And then even if you look at the rest of the SPP procedures, again, it is only under Level 6 that redispatch or curtailment of generation is discussed. Levels 1 through 5 deal only with transmission, not with curtailment of generation. Now, SPP told Smoky Hills, we have the memos, we have the SPP memos, we have the internal Enel and Smoky Hill memos from their investigation and meetings with SPP. What's going on? Why did this happen? SPP repeatedly told them, it's emergency conditions. What's going on? Well, these were unusual times on the system. A number of things happened at once. In this part of Kansas, Sunflower Electric Cooperative is the primary transmission owner. Their system was derated by NERC, the federal entity responsible for setting reliability standards in the industry. So they're told, you can't carry as much as you thought you could carry. So just at a time when Smoky and a bunch of other wind farms are coming on to add new load and new stress on the system, it happens that NERC tells Sunflower, the main backbone there, you can't carry as much as you thought you did. And so the capacity, the electric capacity of the transmission system is derated just as the needs are going up. And then this requires construction to upgrade the system, which means you have to take lines out of service from time to time, which further interrupts the transfer capability of the system. These were not normal times. This is why this was happening. We're not in constant litigation any longer over this. This was an extraordinary period of time. These are not run-of-the-mill curtailments. And this is documented by SPP, by Smoky Hills itself, including their own in-house expert witness, a transmission expert, who they elected not to present a trial, but who wrote the most damaging memos. Any settlement whatsoever through the process here? I'm sorry? Have the parties discussed any settlement of the disputes here? Yes, we had pre-litigation. Though we're discussing legal principles and some fact matters, it seems largely you're fussing over the money. I'm sorry, Your Honor. It seems you're largely fussing over the money of your contract as opposed to the real contract principles and law that govern it. Well, it is a combination of both. The city has had concern about the principles because it's a long-term contract, and they're worried about whether this is going to go on throughout the life of the contract. They have somewhat less concern, and hopefully well-placed, because this was an aberrant period of time on the system. Things seem to have improved, and so now it is about the money. And quite honestly, that's part of why we're just a cross-appellant rather than an initial appellant. The city is a not-for-profit electric system. They're not here trying to take advantage of anybody or do anything. They have to maintain rates as low as possible for their customers. That's all they're trying to do. They don't want to be involved in this litigation. They thought they were getting some wind power and they'd be done with it, and it hasn't worked out that smoothly.  That's why we all have jobs, I suppose. On your definition of the emergency versus economic, let's say even under your definition of what you think qualifies as an emergency, what's in the record that would support that these particular curtailments fell within your definition? Testimony of the two SPP witnesses, Mr. Brown and Ms. Oxendale, the internal memos from SPP to Smoky Hills when they did their investigation when this first started, the internal memos of Enel itself, even the testimony of their expert at trial who admits that the circumstances are different from the steps that SPP might take, the testimony of our own expert who the district court erroneously disregarded his testimony because he based his testimony on the terms of the contract, whereas the Smoky witness, who the court relied on, said that she didn't even look at the contract as part of her analysis. Instead, she talks about the doomsday and cascading outages, which are consequences of something like the extreme TLR6 order that was never issued. There's nothing in the contract. There's nothing in the TLR procedures. There's nothing in any of the other testimony. There's nothing in the SPP testimony that says that in order to be an emergency or to be in a TLR6 condition, you have to have cascading outages. Indeed, the whole idea is to avoid those things, not wait until they happen. The conditions were met. They took the action. It's confirmed by SPP. It's confirmed by every witness in the case, frankly, and much of that is simply not even discussed by the district court. I'd like to quickly touch on another issue, and then if time permits, I may come back to this, and that is the other point of our appeal. The contract clearly allocates to the city 10.1 percent, and if I freeze, I'm going to say 10 percent, 10.1 percent of the output of the project. Now, one important thing to understand is it's the output, the amount of energy actually delivered to the delivery point at any point in time. It's not just 10 percent of the potential capacity of the plant. There is never, never an opportunity under the contract under which the city should receive more than 10 percent, and never is there an opportunity or an obligation on the city's part to pay for more than 10 percent. Yet, in fact, and Smoke even admits it so in their brief, that there are times where they have allocated more than 10 percent. Did they ever allocate more than the 15 megawatts, the total? I believe there were a few. I don't want to be inaccurate here. I think there may have been one or two times where that happened, but I'm not positive of that, Your Honor. That theoretically shouldn't even be able to happen because the plant itself is at 150 megawatts capacity, so that part shouldn't happen, but at lower levels, they got more than what their 10 percent would have been. Now, one of Smokey's arguments is, well, it's impossible to do what the city says should be done, and they lay out in their brief a hypothetical about, well, let's start at 150, in which case the city gets 15, and then if, and now they use the city of Springfield curtailing, I'll come back to that in a moment, but if Springfield self-curtailed out 50 megawatts and they reduce the plant then to 100, well, then the city state should reduce to 10 because it gets 10 percent of what's being produced. Period. That's where it stops, but that's not what they say. They now make up this phony argument and a false standard that now because the city dropped from 15 to 10, well, there's five and you have to reduce the plant further, so now instead of 100, you take it down to 95. That means the city goes to 9.5. That means they drop more. Now you've got to reduce the plant again and all the way down to zero. But that whole daisy chain, that whole domino effect that they harp on so much at trial and in their brief is false. I guess I'm a little unclear on why there's a concern from independents. It seems like it's either the 10 percent or it's the 15. You've represented, this is a city. It's trying to get power to its citizens, its customers. Why wouldn't the city just want to maintain the 15 regardless of whether it was 10 percent or 15 percent or 20 percent? The main reason, there was an early agreement reached among the other offtakers before the city signed, and that's what the court refers to. First of all, let me also point out, no operating agreement can amend the contract, and the contract itself states that the operating committee has no authority to amend the contract. So even if this never produced agreement existed, it doesn't amend the contract. But it's never been produced by Smoke either, just alluded to. Now, early on, yes, one would think, okay, I want 15. Give me my 15. Don't make me get less if somebody else decides they don't want it, except there are economic considerations, and the big one that changed is at certain times now under the way SPP is structured today, the market is structured today, which is different than when the contract was entered into. There's such a thing as negative LNP. You sell into the market locational marginal pricing. Basically, when you deliver energy into the market, you get paid the market rate. Sometimes there's too much, and that market rate becomes a negative, and that actually means that if you inject energy into the market when the LNP is negative, instead of getting paid, you actually have to pay to do that. So the city, nobody ordinarily wants to pay to put the energy in. Well, Smokey doesn't want to pay. That's why they curtail themselves. But then if they brought the production down, to the extent they, because they're lowering the production, lower the city's take, say, from 15 to 10, well, now they're only going to get paid 10 by the city. And because they curtailed, it wouldn't be a curtailment by the city, so we don't pay the production tax credit, and they don't earn the production tax credit because they didn't produce. But the city could curtail, right? Yes, but then we owe them the contract price, plus the production tax credit, plus, well, then either that if we did curtail, or we have to pay the negative LNP. Now, this only happens, this has only been happening during periods of negative LNP. Now, it's interesting. They use the city of Springfield as an example. There is no dispute, there's never been one of these circumstances resulting from the city of Springfield self-curtailing. It has only occurred when Smokey itself, or Enel, curtailed. As the owner-operator, they don't have the same contract with themselves that they have with the city or with the city of Springfield. And so they are furthering their own economic interest at the expense of the city, and causing the city then to get more than the 10% that otherwise would have produced, because they don't want to curtail, because then they don't get paid. It's that simple. Mr. Robbins, your time has expired. Thank you, Your Honor. Mr. Blagan, your rebuttal. Thank you. Thank you, Your Honor. First, just briefly on our initial, our appeal to respond to one thing that Mr. Robbins said. Keep in mind that they also never raised an issue of a defense of unreasonable delay, other than latches. They never raised any of these issues. In fact, argued that we shouldn't be allowed to put on more evidence of the circumstances of these invoicing. But I want to move now to the independents' appeal. And first off, to make clear, because I believe counsel kind of reversed these things, the contract very clearly says they're all economic curtailments unless they're an emergency curtailment. It doesn't say they're all emergency unless they're economic. So emergency curtailment is the exception that has very specific requirements. And it does very specifically, it doesn't, it very specifically incorporates the entirety of TLR 6. In fact, it quotes the exact title of the entire section. Mr. Robbins only wants to focus, independents only wants to focus on 2.9.1, which talks about circumstances. Well, those circumstances apply to most of the, or many of the different TLR levels. They just essentially describe what SPP does, which is to constantly monitor the system and do what they call an N-1 analysis. So there's something about TLR 6 that is different. And so the court correctly looked at the entirety of the TLR 6 definition and not the tiny pieces that independents argued, particularly in 2.9.2 where independents wants to pull out the generation question and completely ignore the discussion of critical status. And that's what the court relied upon. So the court correctly interpreted using the entire definition of TLR 6. Does the contract expressly say, look to, well, I don't think it does, look to all of the procedures. What language should we look to to support what you're saying here about the scope of the district court's world of information to define that? Sure, sure. In 1.3, it's just definitions. It's T and U are the two definitions that apply here. It specifically says that an emergency is defined as a curtailment ordered by SPP, interconnection provider, or transmission owner due to an emergency. And then it defines emergency as emergency condition as defined as, and then it quotes TLR level 6-emergency procedures. That is the title of section 2.9 of the NERC standards that includes the entirety of that definition. So they clearly incorporated the entire definition and not just 2.9.1. And obviously 2.9.1 says circumstances. The contract says conditions, and there's an argument those are equivalent. Well, why would you use two different words? Why not just use circumstances when you're drafting the contract? It clearly is incorporating the entirety of the definition. That is what the court did, and that was correct. Same thing, too, on the generation versus transmission, just briefly on there. 7.3b makes clear that if the SPP curtails generation, it is economic unless it's an emergency. So to argue that all generation curtailments are necessarily emergency under the contract is entirely inconsistent with the plain language of the contract. So they're asking you to essentially ignore one section of the contract, ignore the court's interpretation of another section of the contract, just so they can be in a situation where they never have to pay for a curtailment because that is the outcome that they seek. Now, briefly on the LMP, on that issue, first off, it is not false to say that it's a race to zero the minute one offtaker curtails. The math works out that way. The only way it doesn't work out that way is if Enel, the Enel offtaker, takes on itself energy that Independence is not getting under that math. The only way you stop at 100 under their calculation is if their extra 5 megawatts goes somewhere. Their argument is Enel, which isn't Smoky, by the way, it's an owner of Smoky, but it's a separate entity, Enel has to take their power. That's what they're asking for, and it was laid clear by counsel what they really want is a get-out-of-jail-free card. They don't want to have to monitor the market. They don't want to have to consider LMP. They don't want to have to pay either for the negative LMP or for the curtailment. They want Smoky Hills to bear the entire burden of the system. They're wanting to reform the contract, tear it up, start over in a situation that they believe is advantageous to them, that is absolutely not appropriate, and the court was correct in its findings on that issue. And I'm now out of time, so thank you very much. Thank you, counsel. The court wishes to thank the attorneys for both parties for your presence here this morning. The arguments you've provided the court, the briefing that you've submitted will take your case under advisement and render a decision in due course. Thank you.